Clifford H. and Marjorie Cash Wren v. Commissioner.
Wren v. Commissioner
Docket No. 347-63.
United States Tax Court
T.C. Memo 1965-52; 1965 Tax Ct. Memo LEXIS 278; 24 T.C.M. (CCH) 290; T.C.M. (RIA) 65052; March 11, 1965
Myron E. Anderson, Idaho Bldg., Boise, Idaho, for the petitioners. Richard Rink, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined deficiency in petitioners' income tax for the year 1955 in the amount of $1,019.58. The parties have agreed to certain adjustments with respect to the deficiency. The remaining issues for decision are (1) whether the dissolution of the marital community between petitioner Clifford Wren and his former wife, Oda D. Wren, was a taxable transaction and (2) whether petitioner Clifford Wren was the owner of 40 shares of Prairie Ranches, Inc. stock when it was redeemed so that he was liable for the income tax consequences stemming from the redemption. Also included within this issue is the question of petitioner Clifford Wren's *279 basis in not only the 40 shares but 2 additional shares, the ownership of which is not in question. Findings of Fact Petitioner Clifford H. Wren (hereinafter referred to as petitioner) and Marjorie Cash Wren are husband and wife residing at Grangeville, Idaho. They filed their joint income tax return for the taxable year 1955 with the district director of internal revenue for the District of Idaho. Petitioner married his present wife in November 1955. Petitioner and his former wife, Oda D. Wren (hereinafter referred to as Oda), were married in April 1936. In April 1955 petitioner filed for a divorce against Oda in the State of Idaho. During their marriage, petitioner and Oda resided in Idaho, a community property State. After petitioner filed for a divorce negotiations began between petitioner and his attorney on the one side and Oda and her attorney on the other side regarding a property settlement. These negotiations continued up to and including September 1955. As of September 1955, petitioner and Oda had accumulated the following property, all of which was community property: 1952
Ford Country Sedan
5
Cows
8
Calves
133
Shares of common stock of Prairie
Ranches, Inc.
133
Shares of common stock of Wren
Bros. Grain Company, Inc.
Furniture and fixtures
House and garage situated in the
city of Grangeville, Idaho
*280 In addition to the aforementioned assets, there were in existence certain community debts which will be discussed further at a later point. During the property settlement negotiations, the parties tried to determine the present fair market value of the different community property assets. As an aid in arriving at the value, petitioner's attorney made available to Oda's attorney the books and records of Prairie Ranches, Inc., and Wren Bros. Grain Company, Inc. The books and records of these two companies were utilized by the parties to arrive at the value of the stock of those two corporations held by petitioner and Oda. Throughout the negotiations, the aim of the parties was to arrive at an equal division of the community property. The parties, after about six months of hard negotiations, finally agreed on the values to be assigned to the various community assets. The following schedule shows the values agreed upon to be used in arriving at a division of the community assets and liabilities: Assets
1952 Ford
$ 500.00
5 Cows and 8 Calves
500.00
House and garage
9,500.00
Furniture and fixtures - house
2,538.73
Furniture and fixtures - ranch
1,500.00
133 Shares of Prairie Ranches stock [1]
59,850.00
133 Shares of Wren Bros. Grain Co.,
Inc. stock
422.73
Total
$74,811.46
Liabilities
Loan payable
$11,500.00
Other debts - estimated
2,000.00
Total
$13,500.00
*281 In the latter part of September 1955, Oda's attorney submitted to petitioner's attorney a property settlement agreement representing Oda's last offer that would be made prior to trial. The divorce suit was set for trial at the end of September or the beginning of October 1955. The pertinent parts of the agreement provide as follows: THIS AGREEMENT, Made and entered into this 29th day of September, 1955, by and between CLIFFORD H. WREN, party of the first part, and ODA D. WREN, party of the second part: WITNESSETH: That the parties hereto are husband and wife, and difference have arisen between them which appear to render that relationship intolerable to rach of them, and they have therefore agreed to live separate and apart. It appearing necessary and desirable to each of the parties to define their respective rights and obligations with reference to their community property, and the children born to their marriage, they have agreed and do hereby agree, one with the other and the other with one, as follows, to-wit: 1. That the parties did separate prior to the 30th day of April, 1955, and that they and each of them shall henceforth *282 reside in such place as he or she may choose, without interference or hindrance from the other. 2. That all lobligations [obligations] of the community heretofore constituted by their marriage, except as hereinafter provided, are hereby assumed by the party of the first part, and he agrees to pay and discharge the same. 3. That all property acquired by them since their marriage is community property, and the same has been divided between them as follows, to-wit: The party of the first part shall have as his sole and separate property, subject to all existing liens and encumbrances, as of April 30, 1955, the following personal property: 1952 Ford Country Sedan, Five Cows and eight Calves, 133 Shares of common stock of Prairie Ranches, Inc. 133 Shares of common stock of Wren Bros. Grain Co., Inc. The party of the second part shall have as her sole and separate property, free and clear of all encumbrances, except taxes for 1955, yet subject to all liens and encumbrances suffered by her personally and not those suffered jointly by the parties hereto, all other personal and real property heretofore owned by the parties, except the personal effects of the party of the first *283 part, including specifically, but not exclusively, the following: All personal property located and situated upon and including the real property which said personal property is located, in Grangeville, County and State of Idaho, to-wit: S 1/2 of Lots 4 and 5, the SW 1/4 of Lot 3, all in Block "N" of Hall's Addition to City of Grangeville, according to the plat thereof, on file in the office of the County Recorder of Idaho County, Idaho. The first party further agrees to pay to the second party the sum of Eighteen Thousand and no/100 ($18,000.00) within three (3) days from the date hereof, and execute and deliver to the second party a quit-claim deed to the above described property, together with revenue stamps thereon. 4. All property, either personall [personal] or real, hereafter acquired by either of the parties, shall be the sole and separate property of the one acquiring the same, without claim or interest existing in favor of the other, and each does hereby waive all claim or right in or to the estate of the other. 5. The parties do hereby agree, one with the other and the other with one that he or she shall do nothing to obligate the other financially or otherwise, *284 and except as provided in this agreement, waives all right to support and maintenance being furnished by the other. * * *
It is hereby agreed by the parties hereto that should litigation occur involving the rights of the parties hereto with respect to the other or thtier [their] children that a copy of this agreement may be submitted as evidence in such litigation, and subject to the approval of the court having jurisdiction thereof, become a part of any decree or order entered in such litigation. The first party further and finally agrees to pay to Wm. H. Foster, second parties attorney, an additional sum of Six Hundred and Fifty and 00/100 ($650.00) Dollars as attorney's fees, costs and disbursements expended by the second party. Petitioner discussed this agreement with his attorney. The agreement as written was not acceptable to petitioner for the reason that he did not have $18,000 in cash nor could he obtain that sum of money via a loan since the Prairie Ranches stock, the only asset of value he was to receive, was already pledged for a previous outstanding loan. Petitioner's attorney advised that if they let the matter go to the divorce court the most that could *285 happen was that the court would order that Oda receive 40 shares of Prairie Ranches stock, which was, according to the agreed value, $18,000. However, Prairie Ranches, a family corporation, did not desire to have Oda as a stockholder nor did Oda want to be one. It was then agreed that petitioner's attorney would informally approach the board of directors of Prairie Ranches to see if they would agree to redeem 40 shares of stock from Oda at the agreed price of $450 per share or $18,000. This the board agreed to do, whereupon petitioner's attorney discussed the matter with Oda's attorney. Since the net effect of Oda's receiving 40 shares, which would be redeemed for $18,000, was the same as her offer in the proposed agreement, there was no opposition from her. Petitioner's attorney then explained the matter to petitioner and the parties orally agreed that instead of Oda getting $18,000 in cash from petitioner she would receive 40 shares of Prarie Ranches stock and petitioner would receive 93 shares. This was the only part of the written proposed agreement submitted by Oda that was changed. Since the effect of the change was in all respects similar to the proposed agreement as submitted, *286 petitioner's attorney advised petitioner to sign the written agreement without making any changes. Oda signed the agreement on September 29 and petitioner signed on September 30, 1955. On September 30, 1955, the board of directors of Prairie Ranches met and voted to redeem 40 shares of stock held by Oda for the price of $18,000. It was also agreed that the corporation would redeem 2 shares of the stock owned by petitioner for the sum of $900, whereupon the stock certificate for 133 shares held by petitioner and Oda was turned into the corporation and a new one was issued to petitioner for 91 shares. The corporation issued its check to Oda for $18,000 and to petitioner for $900. The latter sum was used by petitioner to pay attorney's fees, an obligation he assumed pursuant to the written agreement. On October 4, 1955, after a trial on the merits, petitioner was awarded a divorce from Oda. The court order recognized the existence of the settlement agreement made and entered into between petitioner and Oda as being a just and equitable settlement of their community property and affirmed it. However, in stating the property awarded to each party, the court order reflected the division *287 appearing in the written agreement and did not take into consideration the oral modification made by the parties contemporaneous with the signing of the written agreement. The parties agree that the cost of the 133 shares of Prairie Ranches stock to the community was $6,841.52, or $51.44 per share. Respondent, in his deficiency notice, determined that the gain on the redemption of the 42 shares of Prairie Ranches stock was taxable to petitioner. In arriving at the amount of the gain, respondent adjusted petitioner's basis in the stock to reflect his determination that the division of the community property was a taxable transaction. Ultimate Findings of Fact The property settlement agreement as orally modified did not result in a taxable transaction but was merely a division of community property. Of the 42 shares of Prairie Ranches stock redeemed, petitioner was the owner of only 2 of said shares. Petitioner's basis in said 2 shares was $51.44 per share. Opinion Petitioner contends that the property settlement agreement created an equal division of the community property and was not a taxable transaction. He further contends that the written agreement was orally modified *288 so that Oda was really the owner of 40 shares of Prairie Ranches stock and that he was not taxable on the redemption of said stock by Oda. Petitioner admits that as to 2 shares of Prairie Ranches stock he was the owner and that the gain resulting from the redemption of said shares was really $797.12 and not $700 as reported by him on his return. Respondent on the other hand argues that the property settlement agreement as written must control and that pursuant to its terms, petitioner was the owner of all the Prairie Ranches stock originally held by the marital community. Respondent bases this contention on the premise that to allow the terms of the written agreement to be varied by contemporaneous oral modification would be in violation of the parol evidence rule. Accordingly, it is his position that the gain on the redemption of the 42 shares of stock should, in its entirety, be taxable to petitioner. Although not really argued by respondent, it is his position that the division of the community property was in reality a sale by Oda of her interest in the property to petitioner and as such, was a taxable transaction. This is made clear by the adjusting of petitioner's basis in *289 the Prairie Ranches stock to reflect petitioner's cost in acquiring Oda's one-half interest in said stock. We agree with petitioner. A property settlement agreement involving community property may result in a taxable transaction whereby gain or loss would be recognized. (C.A. 9, 1943). However, in those cases where the agreement was treated as a taxable event, the facts in each instance indicate that the parties to the agreement settled their rights by bargain and sale. ; , affd. (C.A. 5, 1947). Alternatively, where the facts indicated that the parties divided the community property equally, or at least made on honest effort to divide the property equally depending upon its value, this Court has held that such agreement does not constitute a taxable transaction. . See also . We have no doubt that in the instant case petitioner and his former wife made every effort to divide *290 their community property as nearly equal as possible. Nowhere in the agreement do we find words indicating that a "sale" or "purchase" was contemplated by the parties. Nor do we find one party giving any particular consideration in return for a particular piece of property. A reading of the entire instrument shows clearly that the parties intended to and did in fact divide their community property. Each community asset was assigned a value. Said value was arrived at by the parties after intensive negotiations. Each party was represented by competent counsel. After arriving at the value, the parties partitioned the assets so that each received total assets of approximate equal value. We do not feel an agreement of this nature was anything more than a division of property whereby instead of each spouse owning a one-half undivided interest in the whole, each owned a 100 percent interest in one-half of the property. The execution of the property settlement agreement was not a taxable transaction. Respondent's entire case centers around the property settlement agreement as written and signed by the parties. He contends that since petitioner *291 agreed to pay Oda $18,000 in cash and that since the community did not have this amount of cash, it cannot be said that a mere division of community property took place, the cash being a noncommunity asset. Whether this makes any difference is at best doubtful. In any event, we believe respondent's understanding of the agreement actually reached by the parties is incorrect. While respondent does doubt whether a change in the written agreement was in fact made, his main contention is that even if there was an oral modification of the agreement, it was made prior to or contemporaneous with the execution of the written agreement. Respondent then states that under these facts a parol agreement which tends to vary or contradict the express provisions of the written agreement cannot be considered in interpreting the agreement. This is known as the parol evidence rule. 17 Am. Jur. 2d 664, Contracts, section 261. We recognize the existence of the parol evidence rule and agree with respondent's statement of the rule. However, there are some exceptions to the parol evidence rule, one of which is applicable to this case. 20 Am. Jur. 985, Evidence, *292 section 1131. The exception we are referring to concerns the nonapplicability of the rule where a third party is involved. In the instant case, the respondent is a party litigant. The respondent was not a party to the 1955 agreement. Therefore, the parol evidence rule does not prevent the petitioner from showing that the written agreement as executed was orally modified. , affd. (C.A. 10, (1963); , remanding a Memorandum Opinion of this Court; (C.A. 7, 1958); (C.A. 5, 1950); , affd. - F. 2d - (C.A. 10, 1965); ; (C.A. 3, 1949), affg. ; (C.A. 6, 1941), affg. ; (C.A. 5, *293 1964); (C.A. 2, 1943), affirming a Memorandum Opinion of this Court; ; and (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. [1]
After listening to the testimony of petitioner's attorney, we are convinced that an oral understanding was reached by both parties to the agreement covering the division of the Prairie Ranches stock. The story as told by petitioner's attorney was not "inherently improbable in the light of the circumstances and the situation of the parties as disclosed by other evidence." (C.A. 9, 1949), affirming a Memorandum Opinion of this Court; Instead of petitioner being awarded the 133 shares of Prairie Ranches stock, it was orally agreed that he would receive 93 shares and that Oda would receive 40 shares of said stock in substitution *294 for the $18,000 from petitioner. We believe this was the agreement as actually carried out, and accordingly hold that when the board of directors of Prairie Ranches redeemed 42 shares of stock, Oda was the actual owner of 40 shares while petitioner was the owner of only 2 shares. Therefore, petitioner was liable only for the gain resulting from the redemption of his 2 shares of stock. The parties having agreed that the original cost per share of said stock to the community was $51.44, this then becomes petitioner's basis in determining the amount of his gain on the redemption. . Decision will be entered under Rule 50. Footnotes
1. An agreed value of $450 per share.↩
1. The recent case of (C.A. 9, 1965), is distinguishable on its facts from the instant case.↩